**GREGORY T. MURPHY**
California State Bar No. 245505
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, CA 92101-5008
(619) 234-8467/Fax: (619) 687-2666
E-Mail: gregory_murphy@fd.org

Attorneys for Rodney Parker

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE LARRY A. BURNS)**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 08CR0854-LAB-01 |
| Plaintiff, | DATE:   May 19, 2008 |
| | TIME:   2:00 p.m. |
| v. | |
| RODNEY PARKER, | REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION |
| Defendant. | |

Rodney Parker, through undersigned counsel Gregory T. Murphy and Federal Defenders of San Diego, Inc., respectfully submits this reply to the Government's response in opposition to Mr. Parker's motion.

**I.**

**AGENT WAKELIN VIOLATED MR. PARKER'S CONSTITUTIONAL GUARANTEE OF EQUAL PROTECTION BY INITIATING AN INVESTIGATION BASED ON MR. PARKER'S PERCEIVED RACE**

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." The Equal Protection clause "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). The commands of the Equal Protection clause apply to the federal government. See Bolling v. Sharpe, 347 U.S. 497, 500 (1954).

Here, there is no question that Agent Wakelin relied on Mr. Parker's Hispanic appearance when initiating his investigation of Mr. Parker. It is the only factor mentioned in the prosecutor's response. [GR

at 3.] Furthermore, other than his observation that Mr. Parker was "Hispanic" and accompanied by a "white" female, Agent Wakelin's only other stated reason for initiating records checks of Mr. Parker was his perception that Mr. Parker had "prison-type" tattoos on his arms and forearms.[1] See GR Exhibit 1 at p. 2. An evidentiary hearing will show that the Agent's claim regarding the tattoos is not credible, and that Mr. Parker's perceived race therefore was the only reason Agent Wakelin began investigating Mr. Parker.[2]

The Ninth Circuit has held in the Fourth Amendment context that Hispanic appearance may not be considered as a factor to support an investigatory stop in Imperial County. See United States v. Montero-Camargo, 208 F.3d 1122, 1133 (9th Cir. 2000) (en banc). The Court noted that the Hispanic population of Imperial County is 73%, and thus "Hispanic appearance is of little or no use in determining which particular individuals among the vast Hispanic populace should be stopped by law enforcement officials on the lookout for illegal aliens." Id. at 1133-34. The Court went on to discuss the inherent dangers related to stops based, even in part, on ethnic or racial appearance:

> The danger of stigmatic harm of the type that the [Supreme] Court feared overbroad affirmative action programs would pose is far more pronounced in the context of police stops in which race or ethnic appearance is a factor. So, too, are the consequences of 'notions of racial inferiority' and the 'politics of racial hostility' that the Court pointed to. Stops based on race or ethnic appearance send the underlying message that those who are not white are judged by the color of their skin alone. Such stops also send a clear message that those who are not white enjoy a lesser degree of constitutional protection – that they are in effect assumed to potential criminals first and individuals second.

Id. at 1135 (quoting City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493 (1989)) (emphasis added). For these reasons, the Supreme Court has repeatedly recognized that reliance "on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with

---

[1] Unless the agent can articulate why Mr. Parker's tattoos seemed "prison like," the fact that Mr. Parker has tattoos should not factor into the Court's evaluation of an equal protection violation or reasonable suspicion. 36 percent of Americans age 18 to 29 have at least one tattoo. See Exhibit A, "Survey Says Ink is In; Tattoos Reach Mainstream," Arizona Daily Star, June 11, 2006. Fully 24 percent of U.S. adults between 18 and 50 have a tattoo. Id. An attribute so widespread in Mr. Parker's demographic is not the sort of specific and articulable fact permitting investigation or seizure.

[2] Mr. Parker asks that he be permitted to participate telephonically from the jury lounge during Agent Wakelin's testimony. Agent Wakelin's credibility is key to the government's burden. As he will be required to identify the "prison-type" attributes of Mr. Parker's tattoos, Agent Wakelin should not have a view of those tattoos at the time of his testimony.

1 constitutional guarantees." Wygant v. Jackson Board of Educ., 476 U.S. 267, 273 (1986).

2 The Supreme Court has indicated that traffic stops based even in part on an individual's racial and ethnic appearance may be challenged on equal protection grounds. This is the evil known as "racial profiling." In Whren v. United States, 517 U.S. 806, 813 (1996), the Petitioner alleged that permitting police officers to make pretextual traffic stops, even when there is probable cause to believe a traffic violation has occurred, gives officers free reign to stop individuals based on impermissible factors such as race and ethnicity. The Supreme Court reiterated that "the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." Accordingly, the Equal Protection clause requires either suppression of the fruits of the discriminatory stop in this case or dismissal of the indictment.

The government may argue that there is no Equal Protection violation in this case because while Agent Wakelin relied on Mr. Parker's ethnic appearance in deciding to stop him, Agent Wakelin also relied on other factors. However, this position is inconsistent with what the Supreme Court said in Whren. There, the Court stated that a defendant could state an equal protection violation based on a racially motivated pretextual traffic stop, even if there was probable cause to believe the defendant committed a traffic violation. In such a scenario, there would be an independent basis for the stop – the traffic violation – but its pretextual, racially motivated nature would still violate the guarantee of equal protection of the laws. See also Gonzalez-Rivera v. INS, 22 F.3d 1441, 1449-50 (9th Cir. 1994) (stating that it is improper to use race or ethnicity "as a shorthand for illegal conduct . . . under any circumstances," and that federal courts should not to encourage such a practice, "even if only indirectly") (emphasis added).

Moreover, if this Court allows the government to argue that there is no prejudice from the racism involved in the stop in this case, the Court will be turning a blind eye to a problem that is exceedingly difficult to ferret out, and that is "illegal, immoral, unconstitutional, inherently wrong, and destructive to a democratic society." Croson, 488 U.S. at 521. Such a holding would also run counter to the federal judiciary's longstanding efforts to prevent racist law enforcement practices:

3

> [W]e have long regarded racial oppression as one of the most serious threats to our notion of fundamental fairness and consider reliance on the use of race or ethnicity as a shorthand for likely illegal conduct to be repugnant under any circumstances. As a federal court, we must be especially careful to ensure that our laws not encourage, even if only indirectly, such impermissible uses of race.

Gonzalez-Rivera, 22 F.3d at 1449-50 (emphasis added).

By countenancing the government's reliance on ethnicity as the sole factor in initiating an investigation of Mr. Parker, this Court would also ignore the fact that an officer who relies even in part on forbidden racial stereotypes likely has skewed perceptions regarding his other alleged bases for stopping an individual. See id. at 1450 ("As we have recognized in prior cases, racial stereotypes often infect our decision-making processes only subconsciously . . . . Thus, Border Patrol officers may use racial stereotypes as a proxy for illegal conduct without being subjectively aware of doing so"); Anthony C. Thompson, Stopping the Usual Suspects: Race and the Fourth Amendment, 74 N.Y.U. L. Rev. 956, 983-987 (1999) (discussing social science research that indicates that people, including police officers, process and interpret circumstances based on their racial stereotypes); Charles R. Lawrence III, The Id, The Ego, and Equal Protection, 39 Stan. L. Rev. 317, 322 (1987) (explaining that "a large part of the behavior that produces racial discrimination is influenced by unconscious racial motivation"). This possibility is almost certain in this case, in which the agent relied on no other credible factor at all in deciding to investigate Mr. Parker.

In sum, Agent Wakelin's reliance on Mr. Parker's ethnic appearance to initiate investigation violated Mr. Parker's right to equal protection of the laws. For that reason alone, this court should hold that investigation and subsequent stop and search are illegal. See United States v. Hartwell, 67 F. Supp. 2d 784, 791-92 (E.D. Mich. 1999) (stating that if officers stop an individual's car at least in part because of his race, an Equal Protection violation occurs, and all evidence uncovered must be suppressed); but see United States v. Lopez, __F. Supp. 2d __, 1999 WL 494007, *9 (D. Or. 1999) (stating that if a defendant can show that he was investigated based on his race, the proper remedy is dismissal of the indictment) (unpublished). The government will be unable to identify a race neutral reason for initiating the investigation because the Agent himself claims no credible race neutral reason. Accordingly, the indictment against Mr. Parker must be dismissed.

## II.

**DETECTIVE BERLINSKY'S STOP WAS NOT SUPPORTED BY REASONABLE SUSPICION**

The prosecutor responds to Mr. Parker's argument that the agents stopped him without reasonable suspicion by arguing Detective Berlinsky made a mistake of fact, not law, that permitted him to stop Mr. Parker's SUV for a violation of California's window tinting law. GR 12. In support of this position, the prosecutor proffers that "Detective Berlinsky, who has been involved in over one hundred traffic stops involving window tinting, was unable to see Defendants through the dark window tint -- Detective Berlinsky was able to see only shadows, which is an indication that the window tint is in violation of the law." GR 12.

These facts are neither in Detective Berlinsky's report nor elsewhere in the meager discovery provided to date. Moreover, even assuming Detective Berlinsky would testify to these "facts" at an evidentiary hearing, the prosecutor misstates both the law and the facts.

**1.  The Law**

California Vehicle Code Section 26708(a)(1) is one of several California statutes regulating automobile window tinting. Pursuant to that statute, the windows on the windshield and to the side of the driver and passenger may receive after-market tinting so long as the tinting permits at least 88% of the light to enter. There is no limitation on the degree of tinting for the rear window or for side windows behind the driver.

Importantly, by its terms, Section 26708(a)(1) applies only to materials "placed, displayed, installed, affixed, or applied" to the window after manufacture. "Glazing materials" used in the manufacturing process are subject to federal standards rather than state standards. Specifically, Federal Motor Vehicle Safety Standard No. 205 provides that the front and side windows may be tinted so long as at least 70% of the visible light can enter. See 49 C.F.R. § 571.205. Other California statutes adopt the 70% standard by reference. E.g. V.C. § 26101, 26104.

The 2000 Mercury Mountaineer comes standard with tinted glass on cabin, privacy tinted glass on rear, and privacy tinted glass on side. See Exhibit B, 2000 Mercury Mountaineer Specifications.

**2.  The Facts**

The prosecutor does not dispute that the tinting on Mr. Parker's SUV complied with California

regulations. Instead, he argues that Detective Berlinsky made a reasonable mistake of fact. GR 11-12. The prosecutor points to three factors as supporting reasonable suspicion despite the mistake: (1) the detective's familiarity with the standard addressing window tinting; (2) his twenty-four years of law enforcement training; and (3) his inability to see Defendants through the tinted windows during the day time. GR 12. The prosecutor specifically claims that "Detective Berlinsky was able to see only shadows." Id.

Mr. Parker urges the Court to consider the credibility of these statements in light of the attached photographs of the SUV. See Exhibit C, Photos of Green Mercury SUV bearing California License Plate Number 4UPT113. As it is plainly possible to see through the windshield and driver and passenger windows--the only windows regulated under California law--it appears Detective Berlinsky has not been candid with the prosecutor. The Court should grant Mr. Parker's motion.[3]

### III.

**AGENT BERLINSKY UNLAWFULLY PROLONGED THE STOP OF MR. PARKER**

The prosecutor urges the Court to conclude that Detective Berlinsky was entitled to detain Mr. Parker until federal agents arrived because "Detective Berlinksy was working with federal agents and had allow [sic] time to secure the occupants of the vehicle and have the federal agents arrive at the scene." GR 13. He also argues that "Detective Berlinsky and federal agents discovered ammunition in the car" during their "search incident to arrest/inventory search" and that "this finding justified prolonging the stop to further investigate."[4] Id.

The Constitution simply does not permit detention for these reasons. A closer reading of the civil case upon which the prosecutor relies reveals the limitations of the rule that "an investigative stop is not subject to strict time limitations as long as the officer is pursuing the investigation in a diligent and

---

[3] This lack of candor also supports Mr. Parker's motion to compel discovery of Grand Jury transcripts and to dismiss the indictment due to improper Grand Jury instructions. The Court instructed the grand jurors that the prosecution generally followed its policy of disclosing exculpatory evidence. If the prosecutor's failure to follow another internal policy, namely the prohibition on presenting evidence the prosecutor should have known was gathered in violation of the law, compounds the harm posed by the Court's earlier instruction.

[4] Of course, Mr. Parker was already--if unlawfully--under arrest at the time of the search of his vehicle.

reasonable manner." Haynie v. County of Los Angeles, 339 F.3d 1071 1076 (9th Cir. 2003). In Haynie, the police officer:

> (1) began following the van because he knew men with guns had been seen in a similar van in the vicinity. He followed it with his police lights flashing. (2) Haynie failed to yield. (3) Deputy Mertens noticed the driver lean to the right as if to conceal or obtain something. (4) Deputy Mertens then turned on his siren, but Haynie again failed to pull over. (5) When Haynie finally stopped, he turned left across oncoming traffic and forced Deputy Mertens to stop in the driveway behind him. Although Deputy Mertens immediately recognized that Haynie did not fit the description of the men carrying guns, (6) he did not know whether the men with guns were, or previously had been, in the rear of the van. Therefore, based on the facts available to him at the time and his own observations, Deputy Mertens acted reasonably when he asked Haynie to exit the vehicle and patted him down for weapons. Deputy Mertens' suspicions were further heightened when (7) Haynie began yelling at him during the frisk. (8) Haynie also failed to obey Deputy Mertens' orders to spread his legs and keep his head facing forward.

Id. (Numbering added).

The stop and arrest of Mr. Parker could not be more different. Detective Berlinsky's only stated justification for stopping Mr. Parker was his alleged--and erroneous--belief that the window tinting violated California law. That belief, in addition to being incredible in light of the photos before the Court, does not justify prolonged detention to "have the federal agents arrive at the scene." GR 13.

Furthermore, unlike in Haynie, no new circumstances gave rise to new increased suspicion. Unlike in Haynie, "[t]he vehicle yielded and stopped on Jimmy Durante Blvd." GR Exhibit 2, p. 29. Mr. Parker responded to the officer's questions and instructions.

Finally, the agents' observation that the "bag carried by the Hispanic male appeared to contain a box similar in shape and apparent weight to a standard box of ammunition" is too general an claim to support a finding of reasonable suspicion. See GR, Exhibit 1 at p.1. Furthermore, when stopped, his codefendant, Angela Wittmer, claimed that she had purchased the ammunition, not Mr. Parker. Id. There was no reason to suspect that Ms. Wittmer was not permitted to possess ammunition. Accordingly, by this point, at the latest, there was no reasonable suspicion to detain Mr. Parker for violating either the window tinting ordinance or the prohibition against possessing ammunition.

The detective nonetheless continued to detain Mr. Parker and Ms. Wittmer. He ordered them out of the car and retained their drivers' licenses until the federal agents arrived and then throughout their interrogation. Notably, although the detective claims to have told the agents that Ms. Wittmer had ammunition and not Mr. Parker, the agents' first pre-Miranda questions were to Mr. Parker. Id. at p.2.

Because this detention extended beyond the time necessary to investigate any excessive window tinting or other wrongdoing by Mr. Parker, and because no additional facts gave rise to additional suspicion, the fruits of the unlawful seizure must be suppressed.

### IV.

**MR. PARKER WAS NOT FREE TO LEAVE WHEN HE WAS SURROUNDED BY FOUR FEDERAL AGENTS AND FOUR ARMED SHERIFFS OFFICERS WITH THEIR HANDS ON THEIR GUNS AND WHILE DETECTIVE BERLINSKY HELD HIS DRIVER'S LICENSE**

The prosecutor argues Mr. Parker was not "in custody" when he was surrounded by four federal agents and four armed sheriffs officers with their hands on their guns, and while Detective Berlinsky retained his drivers' license. From the prosecutor's perspective, Agent Wakelin acted properly under the circumstances by inviting Mr. Parker to admit a crime without first advising him of his Constitutional rights.

A person is "in custody" for purposes of Miranda if a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995). In analyzing the defendant's situation, the Court should inquire whether the "stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." Berkemer v. McCarty, 468 U.S. 420, 437 (1984). "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him in custody for practical purposes, he will be entitled to the full panoply of protections guaranteed by Miranda." Id. at 440 (emphasis added).

Applying this standard to the uncontradicted facts before the Court, the prosecutor's argument that Mr. Parker was not "in custody" cannot be sustained. So long as Detective Berlinsky kept his driver's license, Mr. Parker could not "terminate the interrogation and leave." Moreover, the state of being surrounded by six armed officers, four of whom kept their hands on their guns, plainly exerted pressure on Mr. Parker--and would exert pressure on a reasonable person--to cooperate with an interrogating officer. These are exactly the "inherently compelling" circumstances contemplated by Miranda. See Miranda v. Arizona, 384 U.S. 436 (1966). Under these circumstances, the incantation "you are not under arrest" simply cannot transform an armed seizure into a consensual encounter.

Furthermore, even the prosecutor would agree that Mr. Parker and Ms. Wittmer were in custody

while held in the agents' vehicle.  Although the agents did not advise Mr. Parker of his rights before placing him in that car, they "deliberately elicited" incriminating statements knowing that such statements would be recorded.  Compare Brewer v. Williams, 430 U.S. 387, 400 (1977) (By giving the "Christian burial speech," "Detective Leaming deliberately and designedly set out to elicit information from Williams just as surely as and perhaps more effectively than if he had formally interrogated him.").  The statements must therefore be suppressed.

V.

**AGENTS VIOLATED THE ELECTRONICS COMMUNICATIONS PRIVACY ACT**

The prosecutor responds to Mr. Parker's motion to suppress the warrantless interception of his electronic communications by citing three cases from other circuits: United States v. Clark, 22 F.3d 799, 802 (8th Cir. 1994); United States v. Turner, 209 F.3d 1198, 1201 (10th Cir. 2000); and United States v. McKinnon, 985 F.2d 525, 528 (11th Cir. 1993).  The first two cases rely on the third.

All three cases conclude that the particular attributes of a patrol car render any subjective expectation of privacy unreasonable.  In Turner, 209 F.3d at 1201, for example, the Tenth Circuit observed that "[p]atrol cars bristle with electronics, including microphones to a dispatcher, possible video recording with audio pickup, and other electronic and recording devices."  Similarly, the Eighth Circuit in Clark emphasized that a "marked police car is owned and operated by the state for the express purpose of ferreting out crime. It is essentially the trooper's office, and is frequently used as a temporary jail for housing and transporting arrestees and suspects. The general public has no reason to frequent the back seat of a patrol car, or to believe that it is a sanctuary for private discussions." (emphasis added).  The 11th Circuit in McKinnon likewise accepted the government's argument that "no expectation of privacy exists in a marked police car, which is tantamount to a police officer's office" or jail cell.

This case is different.  The agents did not put Mr. Parker and Ms. Wittmer in a marked police car bristling with electronics, though such vehicles were available.  The agents put Mr. Parker in an unmarked sedan that contained no indication it was a law enforcement vehicle.  Unlike a patrol car, the sedan had none of the trappings of a police office.  It had no computer and no visible stored weapons.  It was not like a jail cell.  There was no screen between the front and back.  It was, in every essential way, a sedan like

any civilian sedan.[5] Mr. Parker's expectation of privacy was therefore fully reasonable.

## VI.

## THE COURT SHOULD COMPEL DISCOVERY

Contrary to the Prosecutor's assertion, the government has not complied with its obligation to produce discovery. Mr. Parker has received the names and reports of only two of the eight agents and officers who witnessed his arrest. Importantly, pursuant to United States v. Fort, 472 F.3d 1106 (9th Cir. 2007), for purposes of Rule 16, "the term 'government agent' includes non-federal personnel whose work contributes to a federal criminal case." To date, the government has produced no search warrant affidavits. The defense has received no photographs of the vehicle, no Henthorn material, and no rough notes. The prosecutor has produced none of the written statements found on Mr. Parker or his co-defendant, even though at least one of those is plainly exculpatory.

## VII.

## THE UNDISPUTED FACTS COMPEL SUPPRESSION

The following facts are uncontradicted in the government's response:

1. Agent Wakelin began investigating Mr. Parker because of his Hispanic appearance and, allegedly, because of "prison-type tattoos."
2. The agents could not see the contents of the bags Mr. Parker and Ms. Wittmer carried from the gun show. The agents concluded that one of the bags "appeared to contain a box similar in shape and apparent weight to a standard box of ammunition"
3. Detective Berlinsky stopped Mr. Parker for a violation of California's window tinting law.
4. The tinting on Mr. Parker's windows complied with California regulations governing window tinting.
5. Detective Berlinsky detained Mr. Parker on behalf of the federal agents until they arrived.
6. Detective Berlinsky retained Mr. Parker's driver's license throughout their encounter. (The prosecution still has Mr. Parker's driver's license.)
7. Agent Wakelin asked Mr. Parker to admit a crime without first advising him of his rights.

---

[5] With the apparent exception that it had rear lights that ticked. GR 16. Mr. Parker does not recall the ticking lights.

8. At the time Agent Wakelin asked Mr. Parker to admit the crime, Mr. Parker was surrounded by eight officers, four of whom held their hands on their guns. Detective Berlinsky retained Mr. Parker's driver's license.

9. Agents recorded Mr. Parker and Ms. Wittmer without their knowledge in an unmarked government sedan. Mr. Parker and Ms. Wittmer believed their conversation was private. The agents provoked incriminating statements by Mr. Parker and Ms. Wittmer.

10. The agents did not obtain a warrant before intercepting Mr. Parker's communications with Ms. Wittmer.

11. In order to locate the guns, it was necessary to remove the center console of Mr. Parker's vehicle.

12. There is no policy permitting state or federal agents to disassemble a vehicle as part of their inventory process.

13. Evidence derived from the above described government conduct was used to obtain an indictment against Mr. Parker.

Because these facts alone make out flagrant violations of Mr. Parker's rights, and because they are not disputed, if the Court concludes an evidentiary hearing is not warranted, the Court should order the indictment dismissed or all evidence seized in this case suppressed.

## VIII.
## CONCLUSION

For the foregoing reason, Mr. Parker respectfully asks the Court to grant his motions.

Respectfully submitted,

DATED: May 15, 2008          /s/ Gregory T. Murphy

**GREGORY T. MURPHY**
Federal Defenders of San Diego, Inc.
Attorneys for Rodney Parker